Hear ye, hear ye, hear ye. The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States and this honorable court. Good morning, gentlemen. We thank you very much for participating in this unusual form of oral argument. Some of us on this court certainly hope that this is a merely temporary matter that will soon be over with. But that said, we have a few rules of the road that I'd like to mention that have been in existence for a while and a couple of new ones. First of all, please mute any cell phones or other equipment that you or anyone else in the background may have so that we don't get interrupted. Second, we're going to allow each counsel five minutes uninterrupted argument time to correct for the problem of, you know, delays in transmission of our voices. Our old rules also pertain. First of all, please do not video, photograph, or record these arguments. These are the same as in New Orleans and they'll soon be posted online. Second is that we have read your briefs and record excerpts. We have not necessarily read all of the records, so we appreciate those record citations. With that, we call case number 19-409-57, United States v. DeRusso, and we'll hear first from Mr. LaFuente. Good morning, please, the court, opposing counsel. It's a privilege to be here with you this morning. I wish I could have been in New Orleans for my very first oral arguments in the Fifth Circuit, but I guess this is better than nothing. With regard to Joseph Andrew DeRusso, I filed my brief on March 23rd, and then about a month later, on April 10th, this court handed down the Huntsbury decision. So in my brief, I neglected to discuss plain error. And so what I'd like to do is I'd like to use my time to begin discussing for plain error analysis to point out some things that I think would be relevant for the court to consider with regard to plain error review. Joseph DeRusso's case is distinguishable from any other case that I've been able to read from Huntsbury, also the Burden case that came from this court, and then from, I'm not pronouncing this correctly, Lavalaise case, I think. Lavalaise. Lavalaise, okay. The thing I noticed on all of those cases is that in each and every one of those cases, the appellant or the defendant stipulated and agreed and admitted that they were a convicted felon. From the very get-go, from the minute Mr. DeRusso was indicted in state court in Victoria County, he's always maintained his factual innocence of any felony or felonious conduct. He filed a motion to quash in state court, arguing that his conduct was nothing more than a misdemeanor because the state had failed to allege harm. And that was the critical issue. And so he's always consistently, even to this day, has always maintained that he agreed with us. And they basically, they vacated his 16 predicate felonies. So that makes DeRusso's case a horse of a different color. It's distinguishable from everything that I've read so far, as far as Huntsbury is concerned, because in Huntsbury, this court stated the district court's failure to instruct the jury concerning defendant's knowledge of their felon status was plainly erroneous. So beginning with that analysis, we have those first two prongs of plain error review. I think this court has pretty consistently stated in the age of rehab, which I'm going to call rehab error, that because in our situation, we didn't object or we didn't ask for an instruction on the issue of the mens rea with regard to status. And so it's understandable how this winds up with this rehab issue that we're talking about plain error review. So then the next part of the analysis is going to be the substantial rights issue. And in level A, the court opined, and I'm going to quote the court, demonstrating prejudice under rehab will be difficult for most convicted felons for one simple reason. Convicted felons typically know they're convicted felons, and they know the government would have little trouble proving that they knew. And I would agree with regard to agree that they were convicted felons. But at this point, at this juncture, I'd like to point the court's attention to the rehab decision, specifically page 2198 and Justice Breyer's opinion. And on that page, Justice Breyer specifically quotes the model penal code, section 2.04, states a mistake of law is a defense if the mistake negates the knowledge required to establish a material element of the offense. Justice Breyer took issue with the just, and he stated, normally that maxim would be true if the defendant or the appellant in this case were to argue, well, I was ignorant of the fact that that statute exists. But that's not what we have here. What we have here is we have a situation where the defendant may have had a mistaken impression about whether his final conviction made him a convicted felon or not. And that makes this very distinguishable because it invokes that particular language of the rehab decision. Our argument is that Mr. DeRuzo was precluded from arguing that he was mistaken about the collateral consequences of that conviction in Victoria County. I say mistaken because it throws a wrench in this entire analysis because ultimately Mr. DeRuzo was proven correct. He was right. Oh, I'm sorry. I don't know how that's doing that. I don't know if y'all can hear that or not. That's my email. We're fine. Okay. It turns out that he was correct in his analysis. He was ultimately vindicated. His conduct, well, you know, even more tragic, his conduct resulted in no convictions whatsoever because even after the Court of Criminal Appeals vacated his 16 felonies, the County of Victoria never picked up those misdemeanors. They never even sought to try to prosecute him. So as he stands today, he's committed no offense whatsoever. And that leads me to the manifest miscarriage of justice and to part of the plain error analysis here. So before you get to that, how do you deal with the Supreme Court decision in Lewis? So Lewis, and the way that I distinguish Lewis is Lewis is definitely pre, I think it's a 1980 case. It's very pre-rehab. And Lewis is dealing with collateral attacks. It's dealing with basically foreclosing a collateral attack in the district court, in the federal district court. But as I'm sure you know, there's language in Lewis, I'm looking at page 62 in particular, although it's elsewhere in the opinion, where the Supreme Court seems to be articulating an interpretive approach that we're certainly going to pay attention to if it's not binding on us, which is that when you have language like this being convicted of a felony, that includes a conviction that may very well be later overturned. In fact, the specific language I'm looking at is no exception is made for a person whose conviction ultimately might turn out to be invalid for any reason. Thank you, Your Honor. My account for that is that Lewis is dealing with the substance of the actual conviction. It's foreclosing a collateral attack in the district court. Rehaf is a horse of a different color because it's talking about mens rea. It's talking about what the defendant knew. No, that's certainly fair enough. But here's my question then. If the issue is knowledge, and you're certainly right that Rehaf, however you pronounce it, it's certainly a knowledge mens rea case. Isn't it pretty straightforward that your client knew the following two things at the time he possessed weapons? One, that he was convicted. And two, he felt that he had a strong appellate remedy, which obviously was ultimately successful. But the point is he knew he was convicted at that time. How does Rehaf help you in that given that dynamic? Sure, Your Honor. Thank you. Well, again, it goes back to the fact that it is a mens rea issue. And I'm going back to the language of Justice Breyer because he specifically invokes mistake of law. And so I think that that's a distinguishing factor because Lewis isn't talking about mistake of law. It's talking about collateral attacks. And so the issue here is that Mr. DeRusso was foreclosed from an opportunity to get a mistake of law instruction. He was foreclosed from basically arguing that he was misinformed. And it's telling that Justice Breyer actually speaks to mistake of law, that he actually effectively... Can you tell us what specifically he thought? So he goes to the jury trial, the jury finds him guilty. He knows that, but he's still in the appellate process. He knows that. So is his mistake that he thought it's not a final conviction that sort of counts until he's done with his appeals or what is the mistake? Precisely, Your Honor. He completely and consistently felt that he was basically for lack of a better word, railroaded in Victoria County. He's always claimed that they were not final convictions. Now, here's another interesting issue. And I noticed this in the government's petition. I'm sorry, Brie, with regard to the binder up case. I think that there's been a notion that my client acquired his firearms after he was convicted. And that's not the case. My client, if you... And I think that it's in the sentencing transcript and I didn't brief it. But I recall in sentencing, my client testified that he had been collecting these firearms since he was 12 years old. This has been a... This is in the PSR. It's in the PSR. It's in the PSR. Okay. So it's in the... I'm surprised that you didn't mention that he's now living in a wheelchair with partial paralysis on his right side. Is that still the case? He's better now, Your Honor. He's mobile. He's out of prison. He was released on compassionate release. He actually had... When the FBI came to his house, he was in a... He may have been naked, but he was in a wheelchair and had a disability of his right side. Correct, Your Honor. That was his contention. Well, that's what he was trying to argue in the district court, that he had had a stroke and that the stroke made him... It was debilitating for him. That was basically the impetus for them coming out to see him because he had those weapons in his home prior to ever being convicted of anything. He'd been collecting those firearms for years. And so he had the stroke. And of course, then they found the weapons. So whether he had the ability or the... Whether he was physically able to dispossess himself, that's interesting because he did have a property interest in those firearms before he was vindicated of the 16 felonies that are now non-existent. But that being said, that's the reason why we requested and we tried to argue that he was on direct appeal before the district court. And we were foreclosed from doing it, understandably, given the state of the law, because this is all pre-rehab. We didn't... I mean, I was impression at that point. I didn't think that we should... Do you think if the case had been tried right now, you would have been allowed to put on the evidence you're talking about that was precluded? I absolutely do, Your Honor, because... And mostly because of Justice Breyer's opinion and his express... He expressly speaks to mistake of law. And I think that that would be Mr. Drusso's case right there. In a nutshell, that he should be allowed to argue that he was not finally convicted, his cases were on direct appeal, whether that does or does not... In light of Lewis, I understand that Lewis would say, well, you're not allowed to collaterally attack it. That's not the issue. The issue is what was his understanding of his direct appeal. And his understanding was that he was not finally convicted. And so that would be the mistake. And that would be the argument that we would make. And given the circumstances now, this man, outside of this UPF felon conviction, has no convictions whatsoever. It's a tragedy because... Mr. LaFontaine. Yes, ma'am. Irrespective of your... Can you hear me? It was breaking up just a little bit. Well, if that happens, just let me know. Irrespective of your argument, is there anything that would preclude this court from going the way of the majority in the Binder Up case? I don't believe that there is. In other words, you made the constitutional argument, did you not, that because of the And that's how I was... And thank you for bringing that up, Your Honor, because that's the reason why I'm trying to present my arguments in this way, taking the miscarriage of justice into the constitutionality of the as-applied analysis. And in Binder Up, the issue was, well, the plaintiffs there sought relief before they possessed the firearms. Here with Mr. DeRusso, he did seek relief. He constantly sought relief. I think counsel for the government took issue with when he filed his petition for discretionary review. It seemed to imply to me that my client took his time to file that petition for discretionary review, which is not the case at all. In Texas, you can't file a petition for discretionary review until the mandate issues. And so if he would have waited for a month or two months to file that PDR, it would have been untimely. And his petition was not untimely. He has consistently stormed up that hill. And that's the issue when it comes to the constitutionality of this. As applied to Mr. DeRusso, it's not just a mischaracter of justice under the plain error review, but it strips him of his fundamental right to possess firearms, something that he had collected since he was 12 years old. And because of a riding roughshod over his constitutional rights in state court, he was put in a situation where he couldn't defend himself. And so that's my analysis under the binder. It kind of ties to the miscarriage of justice in my view, because it seems like it's an unconstitutional application of 922G. Well, let me ask you, could this panel adopt binder up or would we have to go en banc to do that? I believe that this court could adopt binder up. I don't see any distinction. I know that there's some case law pre-binder up that speaks to whether or not an as-applied analysis is cognizable in the Fifth Circuit, but I would like to at least caution the court to consider rehalf in that analysis, because rehalf kind of changes everything when it comes to mistake of law. Is your Second Amendment theory premised on the unfairness of being dispossessed of guns while you're being appealed, or is it on the basis that the felony convictions in state court were not dangerous felonies? Both, Your Honor. Actually, it's actually both. Yes, sir. It's definitely both, because I think there's a trend towards nonviolent felons not being dispossessed. I only have five seconds, but yes, to answer the question, both. Well, the reason I ask is, and obviously I've looked at your briefs, I want to be very precise about these points, because on the first point, people do go to jail. They're incarcerated while their convictions are appealed. So that is, you know, if you can be convicted, then why can't you be dispossessed of firearms? That's at least a conceptual hurdle that you have to deal with. The non-dangerous felony aspect may be more effective, at least at the en banc stage. And that's what I'm thinking, Your Honor. But yeah, I'm trying to definitely tie both of those together. But yes. All right. Thank you, sir. We'll hear next from Mr. Ostreicher. May it please the Court. Just to pick up where Judge Jones left off on the question about whether the panel can do this, or if it's something the en banc court would have to do to adopt the binder-up rationale. And by that, I assume the rationale of the controlling opinion of Judge Jones is that, you know, we're not the only people who read these cases this way. You know, the Everest case, the Massey case especially, that those cases foreclose as applied challenges to 922 G1, in our view. I think other courts of appeals have read them similarly. I think binder-up itself, there were several judges in binder-up itself that have read this court's cases that way. And to be clear, I mean, to be sure, I think, you know, what Everest and violent and non-violent. So I think they specifically rule out as applied challenges on that basis. They're a little bit less clear about whether there's this, you know, sort of non-serious versus serious distinction. But I think there, I think Heller itself comes pretty close to requiring, I think any court that, we think the binder-up court, in fact, erred in light of Heller. Because the Supreme Court and Heller said at page 626, of course, of the opinion that nothing in the opinion should be taken to cast doubt on the longstanding prohibition of firearms by felons. Now, some judges and some parties have read the footnote in that case, footnote 26, to say, well, the Supreme Court said those were presumptively lawful regulatory measures. So therefore, by the word presumption, that's something that can always be rebutted. We don't think that that can be read that way in light of what was said in the text of the opinion, with nothing to cast doubt on the prohibition. And then, of course, in McDonald, the Supreme Court followed up on that and repeated its assurance that nothing should be taken to cast doubt on the restriction. To Mr. DiRusso's point that he was vindicated by the Texas CCA, that's true. And of course, we can't dispute that and don't. But he possessed firearms at a time when the Texas CCA hadn't vindicated him. As a matter of statutory law, Lewis resolves that, as I think Judge Ho was indicating. And there's a footnote in Lewis, footnote, I think it's footnote five, where the Supreme Court says the statute contemplates that when people are on direct appeal, as Mr. DiRusso was at best, it was after he had the intermediate court had affirmed. So he had yet to petition for discretionary review. And footnote five of Lewis says that the statute contemplates that felons will be disarmed during that period. As for tying that into, and he also ties it into his as-applied challenge, the vindication by the CCA, he ties it into his as-applied challenge under the Second Amendment and says, I'm now, I'm here, I stand convicted of nothing, and therefore I'm not dangerous and shouldn't be prohibited from possessing firearms. Our response to that, I think our complete response to that is 921A20, which defines, at least as a constitutional matter, 921A20 excludes from the definition of a predicate felony under the Felon in Possession Statute, any crime or any conviction that has been set aside under state law. I don't know of any, this is not something that's been discussed at length in the briefs or discussed at all really in the briefs, but I don't know of anything that would have precluded Mr. DiRusso from taking advantage of that provision of simply dispossessing himself of the firearms at the time he was convicted, let the appeals process play out, petition the CCA for review, fail, and then he can possess firearms under 921A20. And finally, there was a point made about, there's some indication in the record, there's some question in the record about whether he would have been physically able to at any point in the state proceedings or here, in the federal proceedings. So it's not as though there was any indication that there was some dispensation that he could have gotten because of that. That's just never, that's something that's been raised for the first time here. And to my knowledge, he was able to possess, he acquired these, we don't say, we don't, of course, don't dispute that his response to the Texas Court of Appeals decision was to with him in his possession. But the statute says what the statute says under Lewis. I think the final, very quickly, on the point about mistake of law, I think the Supreme Court's decision in does not overrule this court's decision in Emerson, which says under 924A2, the defendant doesn't need to know his actions are unlawful. And under Henry, he needs only know the legally relevant facts. Under Lewis, the legally relevant fact is, was he convicted of a crime punishable by imprisonment for a term exceeding one year at the time he possessed firearms, which was before the CCA vindicated his claims. The reason I asked the questions about his physical ability at the time that the FBI went into his home is that I at least have not found a single case where the FBI has not committed a sexual assault, aggravated robbery, or, or truly violent crimes. The FBI focused on him because he had written one document, according to the PSR, that identified himself with a sovereign citizen extreme movement. And just like a lot of oddball movements, the fact that a person has that kind of literature in their house does not are per se dangerous to anybody. And when you go and open up the door and find a guy in a wheelchair, naked, barely not able to move his right side, and having had cognitive difficulties from a stroke, it just seems like a, like your trunk, like your office in the Eastern district, I think that's where he was. Yes. He's trying to put notches in their going after real serious criminals. You can take that back to Mr. Cox, although he was not U.S. attorney at the time, and I don't blame him for this. Well, I will, I will relay the message, Your Honor. And I, to be sure it was, but just one of the, just one of the indications of dangerousness in this case was the, this sovereign citizen movement aspect of the case. The main reason that the agents were there was Mr. Geruto hadn't reported for parole. He was, he simply fell off the radar and it was not in the government's view appropriate for, I mean, there was a, there was a relay from the Texas state authorities to agent Palomino in this case. And that's the testimony in the case is that agent Palomino went to his house, went to his apartment, had to track him down with an arrest warrant. Mr. Geruto tried to shut the door on him. I, the government was trying to find somebody who had not reported for parole. So, I mean, just to, just to complete the picture. Do the feds normally go after people who are violating state parole? I, I, I don't know the answer to that. I mean, I, I do. Well, I'm sorry. I was just ranting, but I guess my, my, my more precise question was what I, you know, the problem I had at the outset. As far as the, I apologize. As far as the, the second case. Where any other case where they've gone after somebody while their conviction is pending, because none of these cases, Lewis, Chambers, Binderup, not one of these canter, just decided by now justice or, or dissented by now justice. Not one is, is somebody who's a regulatory conviction is pending appeal. No, I, I think, I think you're right, but I don't think again under Lewis, I don't think that matter. I think under 921 A20, I don't think that matters as a, as a second amendment issue. I don't think that a statute cures a fundamental second amendment problem. What I simply meant to say is that under 921 A20, someone who is on directive view can avail themselves of the, they, they can in, in this case, we wouldn't be here today on, in a 922 G1 prosecution. If Mr. DeRuzzo had let, had dispossessed himself with firearms and let the, the appeals process play out. Okay. If you accept the fact that he was a collector, if you accept the fact that his case was on appeal, then when you say dispossessed, what do you mean? Suppose he had turned them over to his sister. Would you have alleged that that was still constructive possession? I don't know. I don't believe so. I think there are. Go ahead. Excuse me. No, I'm sorry. I believe there are legal procedures for dispossession and I would have assumed that Mr. DeRuzzo was, was made aware of those at the relevant point in time. And there's again, there's just no briefing on this question here about the ability to dispossess in any way that that plays into his second amendment as applied challenge. And this would be an especially poor vehicle, I think, for this court to reevaluate the second amendment law in this area, whether it has to do that through in-bank review or through, if it's something it's able to do at the panel stage, because Mr., so much of this, this comes up in such an awkward posture. This wasn't a civil suit. The plaintiffs in Binderup, the plaintiff in Cantor, they're all civil plaintiffs. There's an ability to play all this out in the context of a proper lawsuit. In Chambers, the fellow had been convicted two years before his indictment got quashed. So he had been convicted and apparently the conviction had not been expunged. In Binderup, they had been convicted long before, and then they were in the process of getting their convictions expunged or no, then they applied for their convictions to be expunged. I guess it was there. I mean, this is just factually different from all those cases. I think in the factual differences, actually, I think the factual differences between this in that case, and this is in Judge Ambrose opinion in footnote six. And again, I think that's the controlling opinion in the case. He emphasized that the plaintiffs there were convicted of state law misdemeanors. Mr. DeRuzzo was convicted again at the time that he possessed firearms, was convicted of a state law felony that carried between two and 10 years in prison. And he was sentenced to four years in prison. The relevant considerations to Judge Ambrose, for example, are for seriousness of the offense that is. How much time did the defendant actually receive? That's an indication of seriousness. In that case, the Binderup plaintiffs received no time to my knowledge. I think one of them received like a $300 fine. I think they were both sentenced to probation. So as the court put it there in Binderup, it was the proverbial slap on the wrist. Mr. DeRuzzo's state law offense was not a slap on the wrist. I think even after the Texas CCA's decision, under Texas law, his crime remains a felony if the state alleges and proves harm. In this case, and you'll see this at 972 to 973 of the record, Mr. DeRuzzo's counsel on cross-examination of Sergeant Poe, the state's lead case agent, he asked him, was there harm in this case? And Sergeant Poe said yes. And counsel said, well, was that presented at the state court level? And of course, the answer to that is no. And again, this is because of the way this has come up. There was no need for the state to allege and prove harm at the time to prove up a felony, or at least it was so far. The state can obviously go back if that's allowed by the decision of the TCCA and do what they're going to do. But where we are right now is he's not convicted of the state felony for the very reason he raised on appeal. So let me turn from the constitutional issue to the rehafe issue. I'm just struggling with this Lewis argument that you're making because that's the whole point. Yes, when you're talking about analyzing whether something is a legally permissible prosecution, you look at the law and you can't claim ignorance to law and whatever. But when you're talking about knowledge, like I didn't know this, then it doesn't matter. I mean, people are not assumed to know all the law when they're talking about actual knowledge. Otherwise, there'd be no point to this rehafe point as it applies to felons. So this is the first case I've seen post-rehafe where I really questioned on a felon. I mean, there's other aspects, obviously, like immigration and so forth. But when we're talking about felons, usually they just say, well, you didn't prove I knew. But there wasn't any argument that they didn't know. Here, there's a good argument, because even if the jury found him guilty and all of that, he may still think he's not convicted. You can be jailed even before you're convicted. That happens all the time. So if you can't post bond and all that. So the bottom line is, what is wrong with his argument here under rehafe? I mean, the judge did it under the law at the time, but it's just wrong under the law now. How can you say it's not? Well, to speak to his knowledge at the time that he possessed firearms, he had served time already in prison. He was in the Texas Department of Corrections. I don't think he could have been mistaken about whether he'd been convicted after he had gone to prison. And there are other facts in the case, too. People go to prison before they're convicted. I mean, but the bottom line is he could construe the law in his mind as a final conviction, and he could construe that he doesn't have a final conviction. I think the Henry case and the Emerson cases, as I cited, I think those go to the point about what exact knowledge is needed. His only knowledge needed, the statute doesn't say he needed to be convicted of a final conviction that went all the way through direct appeal, that he had exhausted all of his alternatives, exhausted his appellate avenues. Again, because Lewis plays into it, I know, only kind of in an indirect way. The main way is that Henry says the government need only prove that the defendant knew the legally relevant facts. The legally relevant fact here in light of Lewis is, was he convicted? And I think the district court in this case, and under 921, I think it's 921A20 again, that that is defined in terms of state law. And as Judge Crone pointed out in her, I think it was the motion, or excuse me, the denial of the new trial motion, and that's at docket 124. She says, looking to that state law, the question is, was there a judgment imposed? So that's the legally relevant fact. Was judgment imposed? Was there a verdict? Mr. DiRuzzo knew there was. He was there in the state court at the time, and Sergeant Poe saw him during the trial. Kathy Stewart, the state district court clerk, saw him when the jury found him guilty. That's at 975. That's the legally relevant fact. He knew of that fact. I mean, you can make that argument to the jury on another, you know, if this case is retried, and that his knowledge argument is not accurate, but it's, he's consistent. I mean, even in this case, he kept arguing he wasn't a felon. He kept trying to put on evidence of that. I mean, this is not something he doesn't think. He really did think that. And at the end of the day, isn't that the question? I mean, I don't want to prejudge. Obviously, I wouldn't be a juror in this case, but the jurors may decide, no, he's making this up. He just kept saying this, but he didn't believe it. But he was very consistent in this, and it strikes me as some evidence that supports a lack of knowledge. And if the jury had heard that and been asked about that, he might have won. And that's exactly what Rehafe is talking about. I mean, we have immigration situations where somebody thinks this certificate is the equivalent of a green card, and no lawyer of, you know, one year's practice would think so. And yet the person thinks that, and that is something they can raise, even though legally they don't have a green card, right? I think it's evidence of his consistent assertion on this point is evidence of a legally irrelevant fact, which is the irrelevant fact of whether his conviction was final on direct appeal, final after exhausting all of his avenues. Again, that's not the inquiry. The inquiry is was he convicted of a crime punishable by over a year? He stood convicted in state, sorry. No, I'm sorry. I think just to sum up, your point is that that fact is legally irrelevant under Lewis. Exactly, yes. Let me, if I may, I want to follow up on your earlier reference to 921-820. And I don't want to put words in your mouth. I want to make sure I heard you correctly. Are you saying that, given the facts today, had you known that the conviction would be overturned and that there would be no felony conviction, no longer on the books? Are you saying that today you would not have brought this prosecution? I think that's right, even though we could have brought this prosecution, again, because of at the time his conviction, so he did in fact violate the statute. Let me be clear. I'm not asking here a legal question. I'm asking a practical question. Because I get, I believe, I understand your theory that you still could have, because his knowledge at the time was still what it was. And the element was what it was at that time. My point, though, is if you're saying to us today that today you would not bring that conviction, you would not bring this prosecution, once the conviction is off the books, I'm just curious why you're maintaining the prosecution now. I don't know of any legal principle that requires you to continue this case today. And maybe Judge Jones's reference to Mr. Cox may be query whether you guys really want to continue with this case. I don't think you have to. I think the central point, though, and I think the reason we are here today, and maybe I misspoke, I'm getting the chronology confused. The point is his flouting the law at the time he possessed firearms. And I know that's a historical fact. Let me be very explicit. I'm asking a prosecutorial discretion question. And so at the risk of wading into practical non-legal issues, my question is simply, I think what you're telling us is, let's say his conviction was overturned the day after you all found the guns. Would you have pulled the plug on the prosecution? And if so, why maintain the prosecution today? I guess standing here myself, I just don't know the answer to that question, having not brought the case. It may be something you all want to I appreciate that, Your Honor. Thank you. If there are no further questions, Your Honors, we would ask you to affirm the judgments for the reasons stated in the brief. But I will go back to Mr. Cox with your argument comments in mind. Thank you, sir. Mr. La Fuente, rebuttal. Yes, Your Honor. So as listening to the colloquy as it existed, one thing came to mind when it came to the second amendment in 1980. And as far as Lewis is concerned, that's a United States Supreme Court case where the Supreme Court had not acknowledged that the second amendment isn't a fundamental individual right. And now it is after Heller. And so then when you take Heller and the fact that the second amendment is a fundamental individual right, and then we add that with the rehave decision with regard to mistake of law, I think that that answers the question right there as far as the as applied analysis. And as Your Honor had pointed out, and I grappled with this at trial with regard to constructive possession, because we discussed this. How could he dispossess himself of those collector's items if he gave it to his sister? Well, I think the hard part is how does he dispossess and then repossess? I don't know. Maybe there is some procedure. I mean, yes, it's easy enough to dispossess forever. I can donate my books to charity. But if I suddenly want the books back, I can't do that anymore. So that's the hard part to me is the dispossess with the ability to repossess without being considered to possess. I don't know. Right. And it's telling because as it stands right now, if you took away the federal conviction that he has for this unlawful possession of the 922 case, he would perfectly be well within his rights to possess all 101 firearms, collector's items. I mean, there was nothing that would preclude him from possessing them. So it's under the facts of this case. When it comes to that as applied analysis, dispossession would be extremely difficult and burdensome. You're talking about 101 guns and over 40,000 rounds, which now he's able to possess if were it not for this for this felony conviction in federal court. And so that's kind of telling when it comes to the constitutional analysis, because these are fundamental rights that were taken away from him. And let's let's preview what an en banc proceeding may or may not. Is there an argument that the illegal practice of medicine is, in fact, a dangerous felony? My argument is that it's not. In fact, if you look at the statute, the plain language of the statute in and of itself, practicing medicine without a license, it's a malum prohibitum case. It's not malum in se. And it's a misdemeanor. And you have to the government has to plead and prove beyond a reasonable doubt harm. So in this case, there was no harm whatsoever. So how could he say how could anybody argue that it's inherently violent to practice medicine without a license? It's not just like being a sovereign citizen. That's a First Amendment right. He has to believe whatever sovereign citizens believe. It doesn't necessarily mean that he's a violent extremist. And when I look at the First Amendment, I was thinking about First Amendment jurisprudence with regard to the Second Amendment, because we were talking about actual innocence. And our argument has always been Mr. DeRouza has consistently claimed that he was factually innocent. He committed no felony. He's been extremely consistent about that. Pardon my forgetting the record. What are the elements of the crime for which he was committed? Is it literally just a licensing offense? It's literally a life hurting somebody in the course of practicing medicine. Yes, sir. It's a licensing offense. I mean, in the state of Texas, practicing medicine without a license has always been a misdemeanor. And I think it was in 2003 when the Texas legislature changed a second part of that three part statute, which which we argued applied to licensed physicians. And Texas is having a hard time with licensed physicians hurting people. And so for a licensed physician to violate the Medical Practices Act was made a third degree felony. The Victoria D.A. took that to mean that all Medical Practices Act violations are third degree felonies. And so that was where we had that impari materia argument. Sorry, I've got to interrupt here. Well, our our video transmission isn't working. It's stalled. It was stalled at four minutes. Now you have less than a minute. I don't know whether you've been able to see the time running or not. Now I can see. And so the courtroom deputy will have to I'm not will have to inform us when the time elapses because we're and I also have problems. I'm not seeing people in real time. And I'll give you you know, I'll give you at least a minute back, Mr. La Fuente, because of this interruption. Thank you. Thank you, Your Honor. Back to where I was, I think we were discussing the elements of the crime. And that's where that's where Victoria kind of ran roughshod over over over Mr. DeRusso, because, you know, the point was the Texas legislature left all of those statutes on the books, specifically the one that made it a misdemeanor to practice license medicine without a license. Mr. La Fuente, do you have any idea why the federal agents came to complain to investigate the probation violation other than the fact that he had written some sovereign citizen letter? I believe that during his Mr. Palomino's testimony, we elicited that. It was my understanding that he became that Mr. DeRusso got onto Mr. Palomino's radar specifically because of that letter regarding sovereign citizenship. It's not it's not the ordinary problem, too. Yes, it's not normal for a federal agent to investigate a state parole violation. That's something that Texas does on its own. And so that was very clear to us that it stemmed from the sovereign citizen letter that Mr. DeRusso wrote. And I guess the other point I'd tie down is Mr. Oestreicher said there was evidence of harm to some of the patients. I read one of the briefs, at least yours, I suppose, saying that there was evidence that he didn't harm anybody by giving him he may not have helped him by giving him these injections, but he didn't physically harm anyone. Right, Your Honor. And it's telling because I'm not sure how Mr. Palomino could testify that people were harmed. He wasn't part of the state prosecution. And in the state court, those people testified that they believed that they got better. And I think that that's one of the reasons why the Victoria County District Attorney's Office chose to read the statute the way they read it, because they didn't have any will. I think we have your argument. I think the time is run. Is that correct, Shirley? Yes. Yeah. Yeah. Okay. Thank you, gentlemen.